**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Maribel Zuniga, | No. CV-21-00243-TUC-JCH |
| Plaintiff, | **ORDER** |
| v. | |
| Gowan Milling Company LLC, et al., | |
| Defendants. | |

In this employment discrimination action, Plaintiff Maribel Zuniga ("Zuniga") alleges that her former employer Gowan Milling Company, LLC ("GMC") unlawfully terminated her under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e; the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621 *et seq*.; the Arizona Civil Rights Act ("ACRA"), A.R.S. §§ 41-1463 *et seq*., and Arizona common law. Doc. 1. Before the Court is Defendant GMC's Motion for Summary Judgment ("Motion") (Doc. 44), which is fully briefed (Docs. 46, 49). For the following reasons, the Court grants the Motion and dismisses this action with prejudice.[1]

## I.    Procedural Defects

There are multiple deficiencies in Zuniga's submitted materials. First, Zuniga violates the local rule for summary judgment motions. Rule 56.1 of the Local Rules of Civil Procedure provides:

> Any party opposing a motion for summary judgment must file a statement, separate from that party's memorandum of law, setting forth: (1) for each paragraph of the moving party's separate statement of facts, a correspondingly numbered paragraph indicating whether the party **disputes** the statement of fact set forth in that paragraph and **a reference to the**

---

[1] Plaintiff's request for oral argument is denied because it would not aid the Court's decision. *See* LRCiv. 7.2(f); *Partridge v. Reich*, 141 F.3d 920, 926 (9th Cir. 1998).

**specific admissible portion of the record supporting the party's position if the fact is disputed**; and (2) any additional facts that establish a genuine issue of material fact or otherwise preclude judgment in favor of the moving party. Each additional fact must be set forth in a separately numbered paragraph and **must refer to a specific admissible portion of the record where the fact finds support**.

LRCiv 56.1(b) (emphasis added).  Zuniga violates this rule by including facts in her Statement of Facts without citation to evidence in the record. *See* Doc. 47 at 7–22 ("PSOF") ¶¶ 1–8, 14, 100; *see also* Doc. 47 at 1–7 ("PCSOF") ¶¶ 1–43.[2] For example, Zuniga's PCSOF ¶ 6 states without record citation that prior to termination "Zuniga had been informed that her work was more than satisfactory and had received performance raises and bonuses." The Court should not have to "scour the record" and guess what a party's alleged facts are based on. *See Keenan v. Allan*, 91 F.3d 1275, 1278 (9th Cir. 1996). Zuniga's failure to provide any evidence supporting PCSOF ¶ 6 is compounded by the fact that she has only that paragraph to support one of the elements of her prima facie case. *See infra*, § IV.B.1.

Zuniga SOF also violates Rule 56.1 by listing rote objections that fail to cite admissible evidence in the record. As an Arizona court has previously discussed,

> [LRCiv 56.1(b)] requires the controverting party to provide a specific record reference supporting the party's position if a fact is disputed; it does not permit explanation and argument supporting the party's position to be included in the response to the moving party's statement of facts. Argument may be made in the response or reply brief on the motion for summary judgment, but within the page limits.

*Pruett v. Arizona*, 606 F. Supp. 2d 1065, 1075 (D. Ariz. 2009) (disregarding "each of [plaintiff's arguments in their statement of facts] except for the word "Controverted" and the references to the record"); *see also Hunton v. Am. Zurich Ins. Co.*, No. CV-16-00539-PHX-DLR, 2018 WL 1182552, at *3 (D. Ariz. Mar. 7, 2018) ("Everything after the word

---

[2] Zuniga submitted her controverting statement of facts and additional statement of facts in the same document. *See* Doc. 47. The controverting statement of facts, (Doc. 47 at 1–7, ¶¶ 1–43), will be referenced as "PCSOF," whereas the additional statement of facts (Doc. 47 at 7–22 ¶¶ 1–131), will be referenced as "PSOF."

'Admits' is improper. …. [Plaintiff] also improperly disputes facts as "incomplete" or "misleading," which is just another way of saying he agrees with the factual statement … but believes additional information is material[.]"). Ignoring this instruction, Zuniga objects to Doc. 45 ("DSOF") ¶¶ 3–8, 11, 12, 14–21, 24–28, and 35–43 simply by stating "Relevance." Similarly, Zuniga objects to DSOF ¶¶ 3–8, 11, 12, 14–19, 31, and 35–43 simply by stating "foundation." Zuniga's other objections are likewise opaque or contain argument suited for the Response brief, and none cite the record. *See, e.g.*, PCSOF ¶¶ 3–8 ("lack of personal knowledge"), ¶¶ 3–8 ("misleading evidence"), ¶¶ 14–18 ("hearsay, authentication"), ¶¶ 20–21 ("takes testimony out of context"), ¶ 31 ("improper opinion"), ¶¶ 35–43 ("mischaracterization of the evidence"). Zuniga's approach suggests she wants the Court to (1) consider each basis for objection individually, (2) construe the meaning of her objections for her, (3) identify what part of the record supports her construed objection, and (4) rule on each objection (potentially ruling in the alternative when different arguments are available). The Court declines to do so with one exception, discussed below. *See infra* § IV.B.2.

Zuniga's SOF also violates this Court's Case Management Order by exceeding 10 pages without leave. *See* Doc. 18 ¶ 7(c) ("Statements of fact required by Local Rule of Civil Procedure 56.1 shall not exceed ten pages in length, exclusive of exhibits.") Zuniga's statement of facts is 15 pages excluding the controverting objections, the certificate of service, and exhibits. *See* Doc. 47 at 7–22.

Finally, Zuniga's Response violates LRCiv. 7.2(e)(1) by exceeding seventeen (17) pages without prior leave of Court. Zuniga's Response is twenty-two (22) pages excluding the certificate of service. *See* Doc. 46. In the interest of adjudicating the motion on its merits, the Court has overlooked Zuniga's violations, and considered her SOF/CSOF, (Doc. 47), and Response (Doc. 46).

///

///

1  **II.    Facts**[3]

2       GMC is part of the Gowan Group of companies headquartered in Yuma, Arizona.

3  DSOF ¶ 2; *see* PCSOF ¶2. GMC provides manufacturing and other services related to the

4  crop protection industry. DSOF ¶ 1; PCSOF ¶ 1. Although GMC has, at times, a dedicated

5  HR representative, it appears to also use HR personnel from the Gowan Group. *See* DSOF

6  ¶ 14. Neither party provided an employee handbook or policy in their exhibits although its

7  existence is referenced and/or disputed in the attached exhibits. *See, e.g.,* Zuniga's

8  testimony, Doc. 45 at 46, 59, 60; Priest's testimony, Doc. 45 at 105, Callahan's testimony,

9  Doc. 47-1 at 44–45, 53–54; Ortiz's Testimony, Doc. 47-1 at 86.

10      In 2003, Zuniga began working for GMC as a Warehouse Attendant. DSOF ¶ 9;

11  PCSOF ¶ 9. Between 2003 and 2020, Zuniga held several positions with GMC including

12  Warehouse Attendant, Warehouse Supervisor, a dual position as Purchasing Manager and

13  Human Resources Manager, and, most recently, Purchasing Manager. DSOF ¶ 10; PCSOF

14  ¶ 7.   Zuniga's employment with GMC was at-will during her active tenure.[4] GMC

15  terminated Zuniga on June 9, 2020. DSOF ¶ 9; PSOF ¶ 5.

16      Zuniga contends, without citation to the record, that she received raises and bonuses,

17  GMC repeatedly informed her that her work was satisfactory, and that she was never

18  subject to disciplinary action before her termination. *See* PSOF ¶¶ 6. Between July 2015

19

20  ───────────────

21  [3] Unless otherwise noted, the facts recited herein are undisputed.  All record citations refer
to the page numbers generated by the Court's electronic filing system.

22  [4] GMC indicates Zuniga was an at-will employee and could be terminated for any reason
or no reason at all. Doc. 44 at 9. Arizona codifies its public policy favoring at-will

23  employment; absent a written employment contract, "[t]he employment relationship is
severable at the pleasure of either the employee or the employer." A.R.S. § 23-1501(A)(2).

24  Zuniga references GMC's progressive discipline policy in her deposition, (*see* PSOF ¶¶ 51,
91; *see also* DSOF ¶ 10), and in her Response. *See* Doc. 46 at 22 ("It is undisputed that Ms.

25  Zuniga was not given notice of the allegations prior to termination, nor had Ms. Zuniga
been given any prior verbal or written warnings prior to termination … Gowan Milling

26  admits it has a tiered system of discipline, yet ignored the system in their imposition of
discipline against Zuniga."). Zuniga, however, provides no evidence to overcome the at-

27  will employment presumption. The Court finds Zuniga was an at-will employee.

28

- 4 -

and July 2020, Curtis Priest ("Priest") was GMC's Plant Manager. PSOF ¶ 15; DCSOF ¶ 15. As Plant Manager, Priest supervised Zuniga. PSOF ¶ 16; Doc. 50 ("DCSOF") ¶ 16. During his term, Priest testified that he never disciplined Zuniga. PSOF ¶ 17 DCSOF ¶ 17. In contrast, GMC argues there were problems with Zuniga's job performance, engagement, and demeanor, first in 2018, and immediately preceding her termination in 2020. DSOF ¶¶ 11, 12, 14.

In 2018, Zuniga served a dual position as both Purchasing Manager and Human Resources Manager. DSOF ¶ 10; PCSOF ¶ 7. At some unspecified time, concerns arose with her role as Human Resources Manager. *See* DSOF ¶ 11. Some unidentified employees had expressed discomfort with Zuniga and were reluctant to report their concerns to her. DSOF ¶ 11. GMC contends that it restricted Zuniga's duties to Purchasing Manager with a focus on warehouse improvement projects. DSOF ¶ 11. Zuniga disputes the characterization of events leading to her serving as a Purchasing Manager only. PCSOF ¶¶ 11–12. The parties agree that this adjustment did not affect Zuniga's salary or other benefits. DSOF ¶ 13; PCSOF ¶ 13. GMC asserts that following the change, GMC's HR related functions were handled by Esmeralda Ortiz ("Ortiz") and the Gowan Group's Director of Human Resources, Lourdes Gonzales ("Gonzales"). DSOF ¶ 14.

In June 2020, Mike Callahan ("Callahan") became GMC's Plant Manager. PSOF ¶ 40 (citing Doc. 47-1 at 42); *see* DCSOF ¶ 94. Priest remained a Plant Manager until July 2020. PSOF ¶ 15; DCSOF ¶ 15. It appears both Callahan and Priest served as GMS Plant Managers during the events in May and June 2020.

On May 28, 2020, GMC employee Felipe Herrera ("Herrera") made a complaint to Ortiz about Zuniga. PSOF ¶¶ 52, 55; DSOF ¶¶ 15–16. Herrera indicated that, on that day, Zuniga was upset about boxes found outside the building and wanted them moved. *See* PSOF ¶ 54; *see also* DSOF ¶ 54. Herrera further claimed Zuniga mistreated him daily and her conduct negatively impacted his health including his sleep. DSOF ¶ 16. According to GMC, Ortiz spoke with other employees who confirmed Zuniga's mistreatment of Herrera. DSOF ¶ 17. Ortiz did not inform Zuniga about the investigation or ask Zuniga for her side

of the story. PSOF ¶ 94; DCSOF ¶ 94.

As part of Ortiz's investigation, six additional employees allegedly provided declarations or statements related to Zuniga's conduct: Luisa Neri ("Neri"), Ruben Dominguez ("Dominguez"), Alejandro Perez Leon ("Leon"), Caleb Juarez ("Juarez"), Sammy Regalado ("Regalado"), and Erick Villalobos ("Villalobos"). DSOF ¶ 18; Doc. 45 at 20; Exh. A. The statements are attached as exhibits to Callahan's affidavit.[5] Leon and Regalado provided declarations, both dated May 28, 2020, about Zuniga. Doc. 45 at 23, 26. On both May 28 and 29, 2020, Villalobos provided a statement and declaration. Doc. 45 at 27, 32. On both May 28 and June 1, 2020, Herrera gave a statement and declaration detailing his complaints against Zuniga. Doc. 45 at 21, 28. On both May 28 and June 2, 2020, Juarez gave a statement about Zuniga. Doc. 45 at 25. On June 2, 2020, Gowan Administrative Assistant Linette Martinez ("Martinez") submitted a letter indicating that Ortiz interviewed Regalado, David Gallardo ("Gallardo"), and Villalobos on May 29, 2020. Doc. 45 at 38. On the same day, Veronica Duran ("Duran") submitted an unaddressed statement saying she was present on May 28, 2020, when Ortiz interviewed Herrera and Leon. Doc. 45 at 39.

The statements detail Zuniga's harassment of Herrera, as witnessed by the employees, and other instances of Zuniga's misconduct. *See generally*, DSOF ¶ 18. Specific observations from the employees include: Zuniga repeatedly demanding that employees identify and/or admit to making a complaint against her to Human Resources; calling employees inept; stating that employees could not work as efficiently as she could; stating that she had been investigated in lawsuits before but nothing ever happened to her; threatening to cut hours and overtime for employees she was upset with; telling employees that she had no respect for the new plant manager; telling employees

---

[5] Zuniga challenges these and the other complainant's statements as unreliable because Affiant Callahan did not speak with the individual witnesses. *See* PCSOF ¶18. Zuniga also argues that the statements submitted by Neri, Dominguez, Leon, Juarez, and Regalado were not "properly authenticated." *See* PCSOF ¶18. The Court considers these objections below. *See infra* § IV.B.2.

she was not going to change and they had to deal with it; refusing to accept responsibility for anything; instilling fear in her employees; acting hostile and negative; abusing her authority; and regularly showing up late and consistently acting rude and dismissive to her employees. *See* DSOF ¶ 18. Zuniga was never questioned about the conduct reported by other employees. PSOF ¶ 18.

The parties dispute the nature and severity of Zuniga's conduct. For example, Zuniga admitted to snapping her fingers at employees, but claims that such gesticulations were meant for her, and were not intended to offend or degrade employees. DSOF ¶ 22; PCSOF ¶ 22. Zuniga admitted to raising her voice when speaking to Herrera and others, but denied it rose to the level of yelling (while also acknowledging that her high tone of voice could be perceived as yelling). DSOF ¶ 23; PCSOF ¶ 23; Doc. 45 at 60. Zuniga also admitted that in the three months before her termination, she experienced issues in her personal life that impacted how she treated employees. DSOF ¶ 26; PCSOF ¶ 26. Zuniga asserts, however, that other managers used more unprofessional language with their subordinates and denies treating her subordinates any worse in comparison to other managers. PSOF ¶¶ 112, 114.

GMC paints a different picture. According to GMC, Zuniga took actions to make employees physically uncomfortable, including turning off the air conditioner in the warehouse at Gowan Milling (Yuma, Arizona) for extended periods of time during the summer. *See* DSOF ¶ 27; Doc. 49 at 3. Zuniga does not dispute the act but argues she had justifications for doing so. *See* Doc. 45 at 57. GMC also asserts that Zuniga admitted to using inappropriate language and derogatory names for employees (including supervisors and managers), and she admitted to possibly creating a hostile work environment in the period before her termination. *See* DSOF ¶ 21, 24–26, 28. According to GMC, Zuniga testified that the only "big mistake" she made at GMC was "trusting the employees" she worked with and "wanting to go above and beyond for them." *See* DSOF ¶ 20.

On June 9, 2020, GMC terminated Zuniga. DSOF ¶ 9; PSOF ¶ 5. The parties dispute who made the ultimate decision. GMC contends GMC Plant Manager Callahan made the

decision. DSOF ¶ 29. Zuniga asserts, without citation to the record, that both Plant Manager Priest and Director of Human Resources Gonzales testified to making a collective decision with Callahan. PCSOF ¶ 29; *see* Priest's testimony, Doc. 47-1 at 20.

Zuniga contends that she was terminated due to national origin,[6] sex, and age discrimination and retaliation. Zuniga contends, without citation to the record, that she is a Hispanic female who was fifty (50) years-old at the time of her termination. *See* PSOF ¶¶ 1–2. Zuniga's allegations of discrimination and retaliation stem from three separate circumstances.

First, on some unspecified date, Carlos Arroyo—a GMC employee—allegedly told Zuniga that Plant Managers Callahan and Priest did not like or understand her accent. DSOF ¶ 31; *see* PSOF ¶ 14. This information came from another employee, Gustavo Navarro, who allegedly heard a conversation between Callahan and Priest and told Carlos Arroyo who then conveyed the message to Zuniga and other employees. DSOF ¶ 32; PCSOF ¶ 32. Callahan and Priest deny ever making any such comments. DSOF ¶¶ 33–34; PCSOF ¶¶ 33–34. According to GMC, Zuniga later characterized the statements as "just gossip." DSOF ¶ 36.

The second circumstance relates to Zuniga's managerial role at GMC. In 2020, Zuniga was the only female manager out of ten managers at GMC. PSOF ¶ 16; DCSOF ¶ 16. Zuniga believes Callahan and Priest did not like her because she was a female Mexican in a high position. DSOF ¶ 37; *see* PSOF ¶ 14. As support, Zuniga identifies 15 employees (both male and female), the vast majority of whom are over 40 years old (with several employees older than Zuniga), who allegedly violated company policies but were neither disciplined nor terminated. *See* DSOF ¶ 38. Zuniga also asserts that the manner and extent of her investigation, following Herrera's complaint, and her inability to respond to the allegations, was handled substantially different from investigations related to other managers. PSOF ¶¶ 18, 38, 43, 94, 117.

---

[6] In her Complaint, Zuniga references race. *See* Doc. 1-3 ¶ XII ("Defendants discriminated against Plaintiff based upon sex, gender, and/or race."). Her Response, however, references only national origin discrimination. Doc. 46 at 3, 5–6.

1   The third circumstance relates to Zuniga's retaliation claim and GMC's termination
2   of former employee Jose Quintero ("Quintero"). DSOF ¶¶ 41–42. According to GMC, it
3   terminated Quintero after he was observed speeding on a road next to the worksite, which
4   had been an issue for some time. DSOF ¶ 42. Allegedly, Zuniga viewed Quintero's
5   termination as a violation of GMC's progressive discipline policy mandating: 1) a verbal
6   warning; 2) a written warning; 3) suspension; and 4) termination. SOF ¶¶ 41–43. Zuniga
7   claims she objected to Quintero's termination because he was on worker's compensation.
8   PSOF ¶ 50. GMC terminated Quintero in October 2018. *See* Doc. 45 at 45; *see also*
9   Callahan testimony, Doc. 47-1 at 52.

10   Zuniga filed this lawsuit on May 6, 2021. Doc. 1-3. On June 11, 2021, Defendants
11   removed the matter to federal court. Doc. 1 at 1–4.

12   **III.    Summary Judgment Standard**

13   Summary judgment is proper only if the pleadings, discovery, and disclosure
14   materials on file, and any affidavits, show that there is no genuine dispute as to any material
15   fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).
16   The moving party is entitled to judgment when the nonmoving party fails to make a
17   sufficient showing on an essential element of a claim in the case on which the nonmoving
18   party has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). There is
19   no genuine issue of fact for trial where the record, taken as a whole, could not lead a rational
20   trier of fact to find for the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio*
21   *Corp.*, 475 U.S. 574, 586 (1986) (nonmoving party must present specific, significant
22   probative evidence, not simply "some metaphysical doubt"); *see also* Fed. R. Civ. P. 56(e).
23   Conversely, a genuine dispute over a material fact exists if there is sufficient evidence
24   supporting the claimed factual dispute, requiring a judge or jury to resolve the differing
25   versions of the truth. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253 (1986); *T.W. Elec.*
26   *Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

27   ///
28   ///

**IV.     Analysis**

### A. *McDonnell Douglas* Framework

In an employment discrimination case, Courts will generally apply the burden shifting framework under *McDonnell Douglas Corp. v. Green*, unless the plaintiff presents direct evidence showing discrimination. 411 U.S. 792 (1973). The *McDonnell Douglas* analysis applies equally to claims brought under Title VII, 42 U.S.C. § 2000e–2(a)(1), and the ADA, 42 U.S.C. § 12102, *et seq. See Aragon v. Republic Silver State Disposal Inc.*, 292 F.3d 654, 658 (9th Cir. 2002); *Snead v. Metro. Prop. & Cas. Ins. Co.*, 237 F.3d 1080, 1093 (9th Cir. 2003). Under *McDonnell Douglas*, the plaintiff carries an initial burden of establishing a prima facie case of discrimination. *McDonnell Douglas Corp.*, 411 U.S. at 802.

As a general matter, the Ninth Circuit "require[s] very little evidence to survive summary judgment in a discrimination case, because the ultimate question is one that can only be resolved through a searching inquiry—one that is most appropriately conducted by the factfinder, upon a full record." *Schnidrig v. Columbia Mach., Inc.*, 80 F.3d 1406, 1410 (9th Cir. 1996) (internal quotations omitted). *See also Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253–54 (1981) ("The prima facie case serves an important function in the litigation: it eliminates the most common nondiscriminatory reasons for the plaintiff's rejection.").

Once plaintiff establishes a prima facie case of discrimination, the burden shifts to the defendant to "articulate some legitimate, nondiscriminatory reason" for the adverse employment action. *McDonnell Douglas Corp.*, 411 U.S. at 802. If the defendant does so, the burden shifts back to the plaintiff to show that the defendant's stated reason for the adverse employment action is a pretext for unlawful discrimination—a burden that merges with the plaintiff's "ultimate burden of persuading the court that he has been the victim of intentional discrimination." *Id.* at 804.

### B. Title VII and ACRA

Title VII prohibits employment discrimination based on race, color, religion, sex,

or national origin. 42 U.S.C. § 2000e-2(a)(1) (Title VII Civil Rights Act of 1964). Because the Arizona Civil Rights Act is "generally identical" to Title VII, the Court will address the ACRA claims together with their corresponding Title VII claims. *See Higdon v. Evergreen Int'l Airlines, Inc.*, 673 P.2d 907, 909 n.3 (Ariz. 1983). *See also Bodett v. CoxCom, Inc.*, 366 F.3d 736, 742 (9th Cir. 2004).

### 1. Prima Facie Discrimination

To establish a prima facie case of discrimination, Plaintiff must show: (1) she belongs to a protected class; (2) she was qualified for her position; (3) she was subject to an adverse employment action; and (4) similarly situated individuals outside her protected class were treated more favorably. *Davis v. Team Elec. Co.*, 520 F.3d 1080, 1090 (9th Cir. 2008). "The requisite degree of proof necessary to establish a prima facie case for Title VII ... claims on summary judgment is minimal and does not even need to rise to the level of a preponderance of the evidence." *Id.* (internal citation omitted).

GMC does not dispute that Zuniga has established the first and third prongs of the *McDonnell Douglas* framework: Zuniga, a Hispanic and Spanish-speaking woman, was a member of a protected class and suffered an adverse employment action when GMC terminated her employment. *See* Doc. 44 at 12–15. GMC, however, argues that Zuniga fails to show she was qualified for her position or that similarly situated employees were treated more favorably. *Id.* Specifically, GMC argues that Zuniga mistreated her subordinates and thus, Zuniga cannot show that she performed well enough to rule out the possibility she was fired based on her conduct. *Id.* at 13. GMC further argues that Zuniga has not identified any similarly situated supervisors who exhibited similar misconduct and were treated more favorably. *Id.* at 13–14.

As to the second prong, Zuniga presents minimal evidence that she was performing

the baseline requirements for her position.[7] Zuniga contends, without citation to the record, that GMC awarded her raises and bonuses, GMC repeatedly informed her that her work was satisfactory, and GMC never subjected her to disciplinary action before her termination.[8] *See* PSOF ¶ 6. The record is devoid of any evidence related to formal written evaluations, disciplinary notices, reprimands, or warnings documenting any problems with Zuniga's job performance or attitude before 2018. Notwithstanding the complaints in 2018, there is no evidence that anyone raised concerns about Zuniga's role as a Purchasing Manager before the events in May and June 2020. *See* PSOF ¶¶ 6, 17. To support their position that Zuniga was unqualified, GMC relies upon employee declarations/statements indicating that Zuniga mistreated her subordinates, displayed a negative attitude, and abused her authority. *See* DSOF ¶ 18; Doc. 45 at 20, Exh. A. Nevertheless, Plaintiff's own deposition testimony, albeit uncorroborated, is sufficient to establish a genuine dispute as

---

[7] The Court notes that nowhere in the Complaint does Zuniga allege that she was sufficiently qualified for her position. *Compare with Sumera v. Holder*, 2014 WL 3058278, *6 (N.D. Cal. 2014) (in screening the sufficiency of a complaint on a motion to dismiss, the Court found allegations that plaintiff "was qualified," "was ably performing his job," "was recognized as having done the job without problem," and "received a positive performance evaluation" sufficiently alleged he was qualified for his position).

[8] Ninth Circuit case law contains conflicting guidance regarding whether a plaintiff must present evidence eliminating the possibility that she was fired for inadequate job performance to establish a prima facie case of discrimination. In *Aragon*, the Ninth Circuit found that such a requirement would "conflate the minimal inference needed to establish a prima facie case with the specific, substantial showing [a plaintiff] must make at the third stage of the *McDonnell Douglas* inquiry." 292 F.3d at 659. However, in an earlier case, *Sengupta v. Morrison-Knudsen Co.*, the Ninth Circuit cited out-of-circuit authority for the proposition that a plaintiff must show, as one element of a prima facie case of discriminatory discharge, that "he was doing his job well enough to rule out the possibility that he was fired for inadequate job performance." 804 F.2d 1072, 1075 (9th Cir. 1986); *see also Pejic v. Hughes Helicopters, Inc.*, 840 F.2d 667, 672 (9th Cir. 1988) (citing *Sengupta*). The analysis contained in *Aragon* contains more detail and is seemingly more consistent with Supreme Court precedent, which establishes that a plaintiff's burden at the first stage of the *McDonnell Douglas* framework is "not onerous." *Burdine*, 450 U.S. at 253. But even if *Sengupta's* standard applies, Zuniga has met her burden because she has identified a genuine issue of material fact regarding her satisfactory job performance with respect to her prima facie case.

1   to her satisfactory job performance, the second prong, in her prima facie case. *See Aragon*,

2   292 F.3d at 660 (noting that an employee's own statement that they were performing at a

3   level equal to that of other employees may be sufficient to establish a prima facie case even

4   though such self-assessment testimony regarding job performance is not enough to create

5   a triable issue of fact on the question of pretext). As such, Plaintiff meets the second prong

6   of her prima facie case.

7   As to the fourth prong, GMC asserts that Zuniga fails to identify similarly situated

8   employees outside of her protected class who engaged in similar behavior and were treated

9   differently. Doc. 44 at 13. Specifically, Zuniga fails to show any other GMC manager who

10  consistently and regularly mistreated employees, retaliated against them for complaining

11  about them, or forced employees to work in extremely hot weather without air

12  conditioning. Doc. 49 at 6–9. For purposes of establishing a prima facie case of Title VII

13  discrimination, "individuals are similarly situated when they have similar jobs and display

14  similar conduct." *Vasquez v. Cty. of Los Angeles*, 349 F.3d 634, 641 (9th Cir. 2003). At a

15  minimum, Zuniga must proffer evidence that a comparator employee had a similar job and

16  engaged in similar conduct. *Id.*

17  Zuniga identifies three managers who she alleges were treated more favorably:

18  Jarrod Harvick, Madin Lopez, and Mike Brandt. Doc. 46 at 8–12. As to Madin Lopez and

19  Mike Brandt, Zuniga fails to submit evidence that these individuals were outside of her

20  protected class or that they engaged in similar conduct. For example, it's unclear whether

21  Madin Lopez is Hispanic and the allegations involving his conduct are too vague to make

22  any sort of meaningful comparison. Zuniga indicates that GMC employee Oscar Salcedo

23  observed Madin Lopez's misconduct, and separately, a complaint was made to HR by an

24  unnamed employee. Oscar Salcedo's statement lacks any detail as to specific conduct,

25  applicable timeframe, or scope. *See* PSOF ¶¶ 30, 31, 107; Doc. 47-1, Salcedo Statement,

26  Ex. 14 ¶ 4 ("I also witnessed manager Madin Lopez and other male managers be verbally

27  abusive to lab employees. The verbal abuse included obscene language.") Moreover, HR

28  personnel did not recall the specific details of the anonymous complaint, indicating that

she recalled the situation as a "misunderstanding." *See* PSOF ¶¶ 87–90; Ortiz Testimony, Statement, Ex. 8 at 84–85. It's unclear whether the two reports refer to the same incident or repeated conduct. As to Mike Brandt, Plant Manager Priest could not recall the specific details of the complaint and reported conduct. *See* PSOF ¶ 21; Doc. 47-1, Priest Statement, Ex. 3 at 26–27 ("That I don't really recall. But I just remember it was – he felt [Brandt] was too hard on him."). The complaints against Lopez (using obscene language with employees) and Brandt (being too hard on an employee) are not comparable to the body of allegations made against Zuniga by multiple employees. As such, Zuniga fails to show that either Lopez or Brandt engaged in similar conduct.

Manager Jarrod Harvick presents a closer question. *See* PSOF ¶¶ 23–29, 45–49, 66, 67, 76, 79, 80–81, 96, 98. Zuniga alleges that her sister, Margarita Ruiz ("Ruiz"), a Hispanic woman who also worked at Gowan Milling, was subject to three incidents with GMC supervisor Jarod Harvick. Allegedly, Harvick would use language to demean Ruiz, yell at her, and would slam and/or kick the door and trash cans. PSOF ¶¶ 96, 98. This conduct was witnessed by other employees, including Sergio Garcia. PSOF ¶ 66. Ruiz complained to Plant Manager Priest about Harvick. PSOF ¶¶ 23–24. Zuniga claims Priest never interviewed witness Garcia. PSOF ¶¶ 66–67. According to GMC, Priest spoke with Harvick and "there were never any alleged incidents again between Harvick and Ruiz." Doc. 49 at 8. Viewing the evidence in Zuniga's favor, however, the Court does not find a genuine factual issue exists as to whether Zuniga was treated less favorably than Harvick. A single subordinate reported Harvick for an alleged pattern of maltreatment witnessed by other employees. The nature underlying Harvick's conduct is unlike the treatment Zuniga allegedly inflicted on Herrera and others. Zuniga's alleged maltreatment varies in scope, quantity, and severity. As reported by five or six employees, Zuniga targeted and threatened individual employees and created a hostile environment. Zuniga fails to show any other GMC manager who was accused of regularly mistreating employees, retaliating against them, or forcing employees to work without air conditioning. In sum, the complaints about Zuniga's conduct are different from Harvick's conduct, and the

comparator evidence is insufficient to establish a prima facie case. The Court will, nonetheless, consider the remaining *McDonnell Douglas* framework.

### 2. Legitimate, Non-Discriminatory Reason

To meet its burden showing a legitimate, non-discriminatory reason for an adverse employment action, a defendant must "raise[] a genuine issue of fact as to whether it discriminated against the plaintiff" by presenting admissible evidence supporting a "legitimate, nondiscriminatory reason" for the adverse employment action. *Burdine*, 450 U.S. at 254–55. The defendant "need not persuade the court that it was actually motivated by the proffered reasons." *Id.* at 254.

GMS has met its burden by articulating a legitimate reason for Zuniga's termination: Zuniga's harassment and targeting of subordinate employees created a "work environment replete with intimidation and retaliation." Doc. 49 at 2. An employer's concern that an employee's negative attitude would lower the morale and productivity of other employees is a legitimate, non-discriminatory reason for terminating an at-will employee. *See Stegall v. Citadell Broadcasting Co.*, 350 F.3d 1061, 1068 (9th Cir. 2003) (holding that an employee's negative attitude about her job is a legitimate, nondiscriminatory reason for termination). GMC has offered evidence supporting its position that Zuniga was fired because at least six Gowan Milling employees made allegations about Zuniga and the work environment she created. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000) (the employer's burden is "one of production, not persuasion"). In addition to the hostile work environment, GMC offers evidence of an unsafe work environment related to Zuniga's control over the air conditioning. DSOF ¶ 27.

Here the Court considers some of Zuniga's objections even though they were improperly made, as discussed above. *See supra* § I. Several of Zuniga's SOF objections relate to the argument in her Response that "Defendant has not produced any statements in affidavit form or sworn testimony from the alleged witnesses [who complained about Zuniga]." Doc. 46 at 13. In her SOF, Zuniga objects to DSOF ¶¶ 15–18 on grounds of "[r]elevance, foundation, lack of personal knowledge, hearsay, authentication, and

misleading evidence," and adds that "Affiant Callahan testified that he did not talk to any of the alleged witnesses." *See* PSOF ¶¶ 15–18. Defendants' paragraphs 15–18 all relate to Callahan's affidavit, where Callahan discusses Ortiz's investigation of complaints against Zunig. *See* DSOF ¶¶ 15–18 (citing Doc. 45 at 14–18, Ex. A at ¶¶ 17, 18, 20). There, Callahan stated:

> [¶] 17. On May 28, 2020, Ms. Ortiz was informed that there were various Gowan Milling warehouse employees who wanted to lodge reports about a particular manager.
>
> [¶] 18. Ms. Ortiz first met with warehouse attendant Felipe Herrera who described his relationship with Zuniga and professed that he was so mistreated by Ms. Zuniga on a daily basis that he had trouble sleeping at night and his health was being negatively impacted due to constant worrying about how Ms. Zuniga would treat him each day at work. [*See*, documents prepared and/or collected in connection with the investigation concerning employee complaints about Zuniga, true and correct copies of which are attached hereto as Exhibit A.] [("*See* documents" insertion in original)]
>
> ….
>
> [¶] 20. Examples of just some of the mistreatment reported by employees includes, but is in no way limited to, the following:
>
> **Felipe Herrera**
>
> ….
>
> **Luisa Neri**
>
> ….
>
> **Ruben Dominguez**
>
> ….
>
> **Alejandro Perez Leon**
>
> ….
>
> **Caleb Juarez**
>
> ….
>
> **Erick Villalobos**
>
> ….

*See* Doc. 45 at 14–18, Exh. A. These statements are supported by allegedly "true and correct copies" of documents generated by Ortiz's investigation. *See* Doc. 45 at 20–40. These documents include descriptions of Ortiz's conversation with Herrera, Leon, Juarez, Regalado, and Villalobos. *See* Doc. 45 at 20–27. The investigation documents also include signed declarations by Herrera, Leon, Juarez, Perez, and Villalobos. *See* Doc. 45 at 28–37, 40. The investigation documents also include a signed statement by Martinez that she was

present at Ortiz's interviews with Regaldo, Gallardo, and Villobos, Doc. 45 at 38, and a statement by Duran that she was present at conversations between Ortiz and Herrara and Perez. Doc. 45 at 39. Reading between the lines somewhat (and setting aside the improper form of argument), the Court infers that Zuniga is arguing that GMC fails to carry its initial burden of production because some of GMC's evidence is inadmissible. With that in mind, the Court will analyze Zuniga's objections.

Zuniga first objects that Callahan's statements are not relevant. PSOF ¶¶ 15–18. Evidence is relevant if it makes a fact more or less probable. Fed. R. Evid. 401. Callahan's statements are relevant because Callahan's testimony makes it more probable that Zuniga was fired based on complaints lodged against her. *See also Gypsum Res., LLC v. Clark Cnty.*, No. 219CV00850GMNEJY, 2023 WL 3724797, at *9 (D. Nev. May 26, 2023) ("[M]ost relevance-based evidentiary objections are moot in the context of summary judgment motions … [because] [a] court can award summary judgment only when there is no dispute of material fact. It cannot rely on irrelevant facts, and thus relevance objections are redundant.").

Zuniga next objects to Callahan's statements citing "foundation, lack of personal knowledge, hearsay, authentication[.]" PSOF ¶¶ 15–18. Zuniga also objects that "Defendant[]s do not produce any statements from alleged witnesses Neri or Dominguez." PSOF ¶ 18. A witness may testify to a matter only if the witness has personal knowledge of the matter, which may be proven by the witness's own testimony. Fed. R. Evid. 602. Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed. R. Evid. 801(c). Business records are not hearsay; business records must be made as a matter of regular practice, at or near the time of the event, and certified as reliable by a custodian or qualified witness. *See* Fed. R. Evid. 803(6). A witness is qualified if the witness understands the record-keeping system. *United States v. Ray*, 930 F.2d 1368, 1370 (9th Cir. 1990). Although previously all evidence at summary judgment had to be authenticated and admissible in its present form, the 2010 amendments to Federal Rule of Civil Procedure

1    dispensed that unequivocal requirement and now "mandate only that the *substance* of the
2    proffered evidence would be admissible at trial." *Dinkins v. Schinzel*, 362 F. Supp. 3d 916,
3    922–23 (D. Nev. 2019) (emphasis in original) (citations omitted)).

4          Callahan's statements about Ortiz's investigation are not hearsay because they are
5    not offered to prove the truth of the matter asserted. GMC offers them primarily as evidence
6    that multiple employees complained about Zuniga. *See, e.g.*, Doc. 44 at 9 (not relying on
7    the truth of the employee allegations); Doc. 49 at 4, 10 (same). Without considering the
8    truth of the allegations, certain other aspects of them are also admissible: that there were
9    five or six complainants, that they complained about different aspects of Zuniga's
10   performance, and that they were not exclusively concerned with Zuniga's use of profanity.
11   Even if Callahan's statements were offered for the truth of the underlying allegations, those
12   would be excused by the exception for business records. Callahan was a custodian or
13   qualified witness of the investigation records because he would be familiar with GMC's
14   recordkeeping practices. *Cf. Cocroft v. HSBC Bank USA, N.A.*, 796 F.3d 680, 686 (7th Cir.
15   2015) ("the custodian need not be the individual who personally gather[ed] ... a business
16   record."); Michael Graham, Handbook of Fed. Evid. § 803:6 (9th ed.) ("Lack of personal
17   knowledge of the entrant or maker may be shown to affect the weight to be given to the
18   record, but does not affect its admissibility.").

19         For similar reasons, Callahan's statements are properly founded, based on personal
20   knowledge, and authenticated. Callahan's statements about Ortiz's investigation all concern
21   something he would be expected to know about. As the GMC Plant Manager, he would be
22   expected to learn that multiple complaints had been lodged against the former HR
23   Manager. He swore that his affidavit was based on his personal knowledge and experience.
24   Doc. 45 at 13. And his testimony shows that he was personally involved in all aspects of
25   GMC's operation, including the issues arising from Zuniga's dual role as a Purchasing
26   Manager and HR Manager. He would also be expected to know at least about the non-
27   hearsay aspects of Ortiz's investigation: that there were five or six complainants, and that
28   their dissatisfaction with Zuniga was not limited to the use of profanity. And the substance

of Callahan's statements, at least those aspects not offered for their truth, would be admissible at trial as discussed above.[9]

For those reasons, Zuniga's objections to Callahan's affidavit are overruled.

### 3. Pretext

If the defendant articulates a legitimate nondiscriminatory reason for the adverse employment action, the burden shifts back to the plaintiff to show that the stated reason was in fact pretextual. *McDonnell Douglas*, 411 U.S. at 804. A plaintiff may demonstrate pretext in two ways: (1) directly, by showing that unlawful discrimination more likely than not motivated the employer; or (2) indirectly, by showing that the employer's proffered explanation is unworthy of credence because it is internally inconsistent or otherwise not believable. *Earl v. Nielsen Media Research, Inc.*, 658 F.3d 1108, 1112–13 (9th Cir.2011). Where evidence of pretext is circumstantial, rather than direct, the plaintiff must produce "specific" and "substantial" facts to create a triable issue of pretext. *Id.* at 1113 (internal citations omitted). Where a plaintiff succeeds in raising a genuine issue of material fact regarding the authenticity of the employer's stated motive, summary judgment is inappropriate because it is for the trier of fact to decide which story is to be believed. *Washington v. Garrett*, 10 F.3d 1421, 1433 (9th Cir.1993).

Zuniga argues that the record shows GMC's proffered explanation lacks credibility, and that discrimination more than likely motivated her termination. Doc. 46 at 17–19. Specifically, Zuniga argues that GMC failed to discipline or terminate other managers for using profane language; GMC deviated from its internal procedures by investigating Zuniga without informing her or allowing her to respond to the allegations; and inconsistent testimony regarding the Zuniga's termination shows that GMC's proffered explanation lacks credibility. *See id.*

First, Zuniga has produced no meaningful evidence showing GMC's proffered

---

[9] Zuniga does not explain her objection that Callahan's statements are "misleading." The Court infers that she objects to GMC's characterization of and inferences drawn from Callahan's statements. That is different from disputing the fact itself. Zuniga's opposing characterization and inferences are properly made in her PSOF, not through objections.

explanation is false or that any GMC employee harbored discriminatory animus towards her because she is a Hispanic woman. GMC has offered evidence of Zuniga's misconduct separate and distinct from the profane language she argues was the crux of her termination. Six GMC employees reported Zuniga's conduct and the work environment she created: Zuniga targeted certain employees, threatened to target employees who made complaints against her, threatened to cut hours and overtime for employees she was upset with, and instilled fear in her employees through hostile  and  negative acts. *See* DSOF ¶ 18. Zuniga also subjected employees to dangerous environmental conditions by limiting air conditioning in the warehouse. DSOF ¶ 27. Zuniga argues that factual inconsistencies, regarding the manner and circumstances around some of the reported statements, create genuine issues of material fact. The Court disagrees. The issue is not whether the statements are true, but whether individuals made statements and brought allegations to GMC's attention. Zuniga must prove both that the proffered reasons for the challenged conduct are pretextual *and* that the animus behind the challenged action was intentional discrimination. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 519 (1993) ("It is not enough, in other words, to disbelieve the employer; the fact finder must believe the plaintiff's explanation of intentional discrimination."). That some witnesses did not recall the details of certain events surrounding their reporting has no bearing on the maltreatment reported by the six employees or the investigation undertaken by GMC. *See Buhl v. Abbott Labs.*, 817 F. App'x 408, 410–11 (9th Cir. 2020) ("The record is replete with evidence of Buhl's misconduct and performance issues. Although Buhl attempts to explain away this evidence, ... he has not offered any other evidence from which a jury could find that Abbott's dissatisfaction with his conduct and performance—dissatisfaction that was expressed by multiple managers on multiple occasions over multiple months—was feigned."). *See also Mitchell v. Superior Ct. of Cal. Cty. of San Mateo*, 312 Fed. Appx. 893, 895 (9th Cir. 2009) (finding plaintiff failed to establish pretext where plaintiff did not offer "any evidence other than the 'timing' to rebut what otherwise appears to be an effort by an employer to confront ballooning discoveries regarding an employee's inappropriate

behavior").

Second, even if GMC's investigation was flawed in some way, "merely pointing to an employer's shoddy investigatory efforts is [not] sufficient to establish pretext." *Humphries v. CBOCS W., Inc.*, 474 F.3d 387, 407 (7th Cir. 2007), *aff'd*, 553 U.S. 442 (2008). An investigation must be flawed in a way that it suggests that the defendant's proffered explanation is pretextual; this generally requires that the investigation is "not just flawed but inexplicably unfair." *See Mastro v. Potomac Elec. Power Co.*, 447 F.3d 843, 855 (D.C. Cir. 2006). GMC's investigation, which culminated in Zuniga's termination, involved interviewing and obtaining statements from witnesses, but not Zuniga herself. At first glance, this appears at odds with Harvick's experience. Although GMC did not perform an investigation with respect to Harvick, Plant Manager Priest discussed the complaint with him, the individual at the center of the controversy. The circumstances, however, are distinguishable: Harvick's complaints were not addressed to or by Human Resources and Human Resources never received any claims of such widespread and severe misconduct involving Harvick as it did with Zuniga. Doc. 49 at 2. GMC further explains that it was not required to interview Zuniga and that doing so would have been pointless based upon the information uncovered during the investigation which left GMC no choice but to terminate Zuniga. Doc. 44 at 9. Zuniga offers no evidence showing the investigation was inexplicably unfair or that GMC failed to act in good faith. *See Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1063 (9th Cir.2002) (material fact is not whether employee committed misconduct, but rather, whether employer "honestly believed its reason for its actions, even if its reason is ... baseless") (citation omitted). Specifically, Zuniga does not argue that discriminatory intent fueled the investigation or that manipulation played a role. Zuniga appeared to testify that she had no basis for regarding the statements from the employees who accused her of wrongdoing as untruthful. *See* Zuniga's testimony, Doc. 45 at 56 ("[Villalobos] says here [']for the past few weeks I've felt the environment in the warehouse has become increasingly hostile.['] It may have and I didn't realize because I was so busy with so many things. I didn't do anything intentional. Like I said, it may have become

hostile and that's the way they were feeling, but they didn't tell me."). There is no contrary evidence to show GMC did not honestly and reasonably believe its proffered reasons for terminating Zuniga. As such, Zuniga fails to offer "specific" and "substantial" facts showing GMC's investigation was so flawed as to establish pretext.

Lastly, Zuniga attempts to establish pretext by referencing inconsistent testimony regarding who made her termination decision. Zuniga argues that both Priest and Gonzalez had a role in the decision. The relevant testimony as to Priest:

> Q:    Did you have any part in the decision to terminate Ms. Zuniga?
> A:    Yes, I did. Yes.
> Q:    Did you make the decision to terminate Ms. Zuniga?
> A:    I'd say it was a collective decision among a few people.
> Q:    And who were those people?
> A:    I would say Mike Callahan, myself, and Esmeralda Ortiz.

Priest's testimony, Doc. 47-1 at 20. Testimony relevant to Gonzalez includes:

> Q:    Okay. Did you come to any conclusions prior to meeting with Mr. Callahan?
> A:    No.
> Q:    Did you recommend to Mr. Callahan that he terminate Ms. Zuniga?
> A:    Yes.

Gonzalez's testimony, Doc. 47-1 at 71. Zuniga's characterizations are immaterial. Zuniga produces no "specific" and "substantial" facts showing the persons claiming responsibility for Zuniga's termination decisions—Callahan, Priest, or Gonzales—were motivated by discriminatory reasons. *See Bradley v. Harcourt, Brace and Co.*, 104 F.3d 267, 270 (9th Cir. 1996) ("To avoid summary judgment, Bradley must do more than establish a prima facie case and deny the credibility of the [defendant's] witnesses. She must produce specific, substantial evidence of pretext.") There is no evidence that these three actors offered inconsistent explanations for her termination or otherwise disbelieved the reason for the termination decision. Because Zuniga fails to establish pretext, summary judgment is appropriate as to the Title VII and ACRA claims.

///

- 22 -

## C.  Title VII and AEPA Retaliation

GMC moves for summary judgment on the retaliation claims, construing Zuniga's claims under the Arizona Employment Protection Act ("AEPA"), A.R.S. § 23- 501(3)(c)(iii), which permits an employee to assert a wrongful termination claim if they are terminated for reporting an alleged violation of an Arizona statute or the Arizona Constitution. Zuniga argues that she was retaliated against because she opposed Jose Quintero's ("Quintero") 2018 termination. PSOF ¶ 50; PCSOF ¶11 ("Ms. Zuniga contends that she was removed from the position of Human Resources Manager because she objected to the termination of an employee who was on worker's compensation at the time."); DSOF ¶¶ 41–43; *See* Compl. at 9 ("Plaintiff alleges that Defendants retaliated against her. Plaintiff was targeted by Defendants as she was removed from her position as Human Resources manager for disagreeing with the other managers regarding the termination of employees. Plaintiff informed the other managers that she believed Defendants were violating state law and company policy in terminating the employees.").

To establish a prima facie case of retaliation under the AEPA, plaintiff must show: (1) that she engaged in a protected activity, (2) that she suffered an adverse employment action, and (3) that there is a causal link between the two. *Hernandez v. Spacelabs Med., Inc.*, 343 F.3d 1107, 1113 (9th Cir. 2003). An AEPA retaliation claim uses the same framework as a Title VII retaliation claim. *See Whitmire v. Wal-Mart Stores Inc.*, 359 F. Supp. 3d 761, 796 (D. Ariz. 2019). An employee must prove the protected activity was the "but-for" cause of the adverse employment action. *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013). In other words, the adverse employment action would not have occurred in the absence of the employee's protected activity. *See id.*

Zuniga did not respond to the retaliation claim challenge and does not establish a prima facie case of retaliation. *See generally*, Doc. 46. Zuniga has failed to show that she was engaged in a protected activity or a causal connection between any purported protected activity and the adverse employment action she suffered. Quintero's termination occurred in 2018, and GMC possibly "demoted" Zuniga as Human Resources Manager shortly

thereafter. The Ninth Circuit has held that "in order to support an inference of retaliatory motive, [a] termination must have occurred fairly soon after the employee's protected expression." *Villiarimo*, 281 F.3d at 1065. Thus, the timing of a plaintiff's complaints may establish a "causal link" sufficient for a prima facie case of retaliation. *See id.* (citing cases holding that a four month gap, an eight month gap, a five month gap, and a four month gap between protected activity and termination is insufficient to establish causation). Zuniga, however, did not make this argument in her Response.

Additionally, even if Zuniga could establish a prima facie case, summary judgment would still be warranted. As discussed above, GMC has met its burden of production to offer a legitimate, nondiscriminatory reason for Zuniga's 2020 discharge, and Zuniga has failed to point to "specific and substantial" evidence to demonstrate that GMC's proffered reasons are pretextual. *Villiarimo*, 281 F.3d at 1062. Thus, Zuniga has not rebutted Defendants' legitimate, non-discriminatory reasons for termination. For these reasons, the Court grants the motion for summary judgment as to Zuniga's retaliations claims under Title VII and the AEPA.

**D. ADEA Claims**

Claims of age discrimination based on circumstantial evidence are analyzed under the *McDonnell Douglas* framework. *Sheppard v. David Evans & Assoc.*, 694 F.3d 1045, 1049 (9th Cir. 2012). *See also Shelley v. Geren*, 666 F3d 599, 607–08 (9th Cir. 2012) (indicating *McDonnell Douglas* burden-shifting applies to summary judgment evaluation of age discrimination claims post-*Gross*). Thus, to survive summary judgment on her claim for a violation of the ADEA under a disparate treatment theory, Zuniga must first establish a prima facie case of age discrimination.

To state a prima facie case of age discrimination under the ADEA, plaintiff must show that (1) she belongs to a protected class (at least 40 years old), (2) she was performing her job satisfactorily, (3) she suffered an adverse employment action, and (4) she was replaced by substantially younger employees with equal or inferior qualifications. *O'Connor v Consol. Coin Caterers Corp.*, 517 U.S. 308, 313 (1996) ("Because the ADEA

prohibits discrimination on the basis of age and not class membership, the fact that a replacement is substantially younger than the plaintiff is a far more reliable indicator of age discrimination than is the fact that the plaintiff was replaced by someone outside the protected class.").

As set forth above, the Court concludes there is sufficient evidence to create a genuine dispute whether Zuniga was performing her job satisfactorily at the time of her termination. The Court also finds that Zuniga was a member of a protected class, see PSOF ¶¶ 1–2 (Zuniga contends she was fifty (50) years-old at the time of her termination), and that she suffered an adverse employment action. The only question, then, is whether Zuniga's circumstance gives rise to an inference of age discrimination.

Zuniga has produced circumstantial evidence of age discrimination in the form of comparator evidence involving Jarrod Harvick, a purportedly "younger" manager who was not disciplined for allegedly similar conduct. See PSOF ¶¶ 23–29, 45–49, 66, 67, 76, 79, 80–81, 96, 98. GMC's decision to not discipline Harvick does not support prima facie discrimination. Zuniga offers no evidence showing Harvick's is substantially younger with equal or inferior qualifications, provides no evidence to support that age-related bias influenced GMC's termination decision, and did not respond to the ADEA challenges in her response. For the reasons stated above, the Court also finds that Zuniga did not engage in similar conduct to Harvick. Zuniga fails to establish a prima facie ADEA claim. Accordingly, the Court grants GMC's summary judgment motion as to ADEA claims.

## V. Order

**IT IS ORDERED GRANTING** Gowan Milling Company, LLC's Motion for Summary Judgment (Doc. 44). **IT IS FURTHER ORDERED DIRECTING** the Clerk of the Court to enter Judgment for the Defendant Gowan Milling Company, LLC and against the Plaintiff Maribel Zuniga.

Dated this 25th day of September, 2023.

John C. Hinderaker
United States District Judge